81 F.3d 160
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Joseph HERRING, Plaintiff-Appellee,
v.
Washington LACY, III, Defendant-Appellant.
 No. 95-3535.
 United States Court of Appeals, Sixth Circuit.
 March 11, 1996.
 
 Before: BOGGS and DAUGHTREY, Circuit Judges; and McKEAGUE, District Judge.*
 PER CURIAM.
 
 
 1
 Defendant police detective Washington Lacy, III brings this interlocutory appeal from the denial of his motion for summary judgment on grounds of qualified immunity in this § 1983 suit for the use of excessive force against Joseph Herring. After noting that we have jurisdiction to review Lacy's legal argument for qualified immunity, we affirm the district court's denial of Lacy's motion for summary judgment.
 
 
 2
 * The facts of this case present a classic "one person's word against another's" situation. On June 3, 1993, Detective Donald Gaines of the Akron, Ohio Police Department, while investigating the gang rape of a 14-year-old girl, interviewed Konrad Herring, a juvenile living at the home of his mother, Almondine Herring, and his step-father, Leon Poole.[1] Joseph Herring, Konrad's father, was also present as Detective Gaines questioned Konrad. At some point, Detective Gaines asked Konrad if he would be willing to answer additional questions at an Akron police station, inviting Almondine, Leon Poole, and Joseph Herring to come along. Konrad agreed.
 
 
 3
 Joseph Herring travelled alone, while Konrad, Almondine, and Leon Poole travelled together. As a result, Joseph Herring arrived at the police station after Detective Gaines had already begun to question Konrad. Leon Poole and Almondine were present during Konrad's questioning, however. Joseph Herring asked Detective Lacy, who was on duty at the front desk, if he could be allowed to sit in on his son's questioning. Detective Lacy refused. While Lacy was away from the front desk, Joseph Herring somehow located the interrogation room where Gaines was questioning his son. Herring entered the room, sat down and listened to the questioning, apparently without objection from Gaines. When Lacy returned to the front desk and noticed Joseph Herring missing, he went to look for him in the interrogation room. An altercation of some sort ensued between the two. Herring claims he was seriously injured as a result, while Lacy claims he only pushed Herring, momentarily knocking the man off balance, and then grabbed Herring by the collar.
 
 
 4
 Herring checked himself into the emergency room of Akron General Medical Center, and was released with the following report:
 
 
 5
 CHIEF COMPLAINT, HISTORY, PHYSICAL FINDINGS: [illegible]--neck pain. H--29 yom[2] who states that he was at the police station and was given conflicting instructions from 2 different police officers with regard to seeing his son. States that he was pushed by one officer from behind and then had some discomfort in his neck. This occurred [sic ] just prior to presentation. Denies numbness or tingling. States that he has a hx of "neck problems." NO previous hx of surgery to the neck. On exam--vitals stable, NAD. Pleasant, cooperative, adequate historian. Exam of the neck reveals no evidence of trauma. No ecchymosis or abrasion. No tenderness or palpation over the spinus [sic ] processes. He does have slight tenderness to the right of the midline posteriorly. There is a fair range of motion noted. Neuro-upper extremities fully intact.
 
 
 6
 DIAGNOSIS: MILD CERVICAL STRAIN.
 
 
 7
 TREATMENT/DIAGNOSIS: Pt. discharged home on Motrin PRN and given cervical strain instructions, to follow up in the clinic in several days if not improving.
 
 
 8
 Herring followed up this treatment by consulting with Dr. Roger N. Ferreri months later. In a letter addressed to Herring's counsel, Wesley A. Dumas, Sr., and dated December 23, 1993, Dr. Ferreri discussed Herring's medical condition:
 
 
 9
 In the intervening days [after being released from the emergency room] he has continued to suffer from neck pain and stiffness, often radiating to the arms, and has developed persistent headache....
 
 
 10
 Review of prior medical history, history pertinent to the assault, radiologic studies, and physical examination were all consistent with the diagnoses of facial contusion, concussion, cervical strain, and herniated cervical disc. These are all proximately and causally related to the assault of June 3, 1993.[3]
 
 
 11
 Treatment to date has been conservative in nature and included non-steroidal anti-inflammatory medicines, relaxants, analgesics, referral to physical therapy, and surgical referral for definitive treatment of his herniated cervical disc.
 
 
 12
 Herring had been responding slowly to treatment and definitive therapy awaits both surgical and physical therapy consultation. Prognosis, therefore remains guarded.
 
 
 13
 Herring's medical expenses to date are $1,928.
 
 
 14
 The versions of events related by Herring and Lacy diverge markedly on the circumstances surrounding their altercation at the police station. Lacy maintains that the office was crowded with many people that day, and that, especially in light of an attack on a police officer while sitting at his desk a few weeks earlier, Lacy was concerned with maintaining order. For this reason, he refused to allow Herring to go into the interrogation room where Gaines was questioning his son. Herring, on the other hand, contends that the office was empty, except for a handful of detectives and some painters. Herring claims that Lacy refused to admit him into the interrogation room, because the detective assumed that Leon Poole was Konrad's father, and that Herring had "no business" being present during Konrad's questioning. There is some evidence to support this theory in Lacy's own deposition.
 
 
 15
 Herring claims that sometime after Lacy found him in the interrogation room, Lacy struck him on the back of the head and both sides of the neck with his hands, forcing Herring to fall first on his knees, then prone to the floor. (Lacy is 6'1"' and weighs over 275 lbs. Herring, by contrast, is 5'8"' and weighs only 135 lbs.) Lacy then allegedly picked Herring up by the front of the neck and back of the hair, choking him. Perhaps in corroboration of this, perhaps in contradiction of it, Leon Poole stated in his deposition that Lacy had Herring in a "half nelson." Lacy is then supposed to have "started babbling," "this is my house and while you're in my house you do what I tell you." Herring claims that Lacy then dragged him over to a desk and threw him down on top of it, holding him there.
 
 
 16
 Lacy's version of events, not surprisingly, is very different. Lacy allegedly went to the interrogation room and asked Herring to step outside with him. He took Herring by the arm, and Herring came willingly a few steps, but once outside, when Lacy told him that he could not roam around the police station, Herring allegedly said he "didn't give a damn where he was." He then "flung" the arm that Lacy was holding him by, so Lacy pushed him forward. After Herring regained his balance, but without falling on the floor, he came towards Lacy. Lacy then asserts that he grabbed Herring by both sides of the collar. Gaines, hearing the struggle, then intervened. Gaines corroborates this, but did not see exactly what transpired between Lacy and Herring after they left the interrogation room. He only heard "scuffling" and saw Lacy grabbing Herring.
 
 
 17
 In response to a complaint by Herring, the Akron Police Department conducted a Supervisor's Investigation, which determined that the complaint was unfounded. Herring brought suit against the City of Akron, Chief of Police Larry Givens, and Lacy on June 2, 1994. After the filing of an amended complaint, and some discovery, defendants moved for summary judgment on January 6, 1995. On April 28, 1995, the district court granted the motion for summary judgment with respect to all claims and defendants, except Herring's Fourth Amendment excessive force claim, and pendent state law tort claim of assault and battery, against Lacy. The district court's order does not include a memorandum explaining the reasoning behind the order. Lacy timely filed this interlocutory appeal from the district court's ruling.
 
 II. JURISDICTION
 
 18
 Lacy argues that, even if Herring's version of the facts is fully credited, the force he used against Herring was not excessive as a matter of law, based most significantly on an argument that the force used was applied in a special setting. We must determine whether we have jurisdiction to review this claim. While neither party raises a jurisdictional issue in this case, this failure, of course, cannot prevent a federal court from considering its jurisdiction, as it is axiomatic that the issue of subject matter jurisdiction must be raised sua sponte by a federal court where appropriate. Community First Bank v. Nat'l Credit Union Admin., 41 F.3d 1050, 1053 (6th Cir.1994).
 
 
 19
 In the recent case of Johnson v. Jones, 115 S.Ct. 2151, 2156 (1995), the Supreme Court resolved a split among the circuits and held that the courts of appeals lack jurisdiction under 28 U.S.C. § 1291 to hear interlocutory appeals of district court summary judgment orders entered in qualified immunity cases when those appeals are based on "question[s] of evidence sufficiency." Johnson found jurisdiction lacking in a 42 U.S.C. § 1983 case brought against Illinois police officers on a claim of excessive use of force, where three of the officers asserted a defense of qualified immunity predicated on an argument that the plaintiff had not pled any facts to indicate that they were among the police officers that allegedly beat the plaintiff. Id. at 2153. The plaintiff countered that he pled a case against unnamed officers, and alternately, that the depositions of the three officers in question showed that they were at least present at the beating, even if they did not participate, and that there was law in the Seventh Circuit (where the case was brought) indicating that officers who are passive in the face of the use of excessive force by other officers violate the clearly established constitutional rights of the victim, just as those officers inflicting the beating do. Id. at 2153-54.
 
 
 20
 The applicability of Johnson to this case is clear. It would be a mistake, however, to dismiss this appeal for lack of jurisdiction simply because there are some disputed facts and because the question of whether the force Lacy used was excessive is a question of degree. There are important differences between this case and Johnson, and these differences should not be obscured. Moreover, this case falls into a category of cases that Johnson admitted was difficult and "cumbersome"--those cases where the district court failed to give any reasons for its denial of a government defendant's summary judgment motion. Id. at 2159.
 
 
 21
 In Johnson, the Court rejected arguments by the police officers that the rule the Court had created would be too difficult for the courts of appeals to administer, because (1) the defendants could always craft a qualified immunity claim over which jurisdiction would exist, and (2) it would be too difficult to separate the reviewable claims from the unreviewable claims. Id. at 2158-59. The Court noted that the first argument is defeated by the fact that the courts of appeals could decline to review those claims whose resolution depended on crediting one version of the facts over another.[4] Id. at 2159. The second argument was rejected because when a court of appeals faces this situation it could take as given the facts that the district court assumed. Ibid. Here, however, the district court did not inform this court of the facts it was assuming. In these circumstances, the Court of Appeals is to "undertake [the] cumbersome review of the record to determine what facts the district court, in the light most favorable to the non-moving party, likely assumed." Ibid. We follow this directive in our outline of the facts given below in connection with a discussion of whether qualified immunity is available to Lacy in this case.
 
 
 22
 Though this case involves a factual dispute, we must exercise jurisdiction over Lacy's interlocutory appeal, because Lacy argues that the force used, however fairly construed from the record, was not excessive as a matter of law. See Sanderfer v. Nichols, 62 F.3d 151, 153 n. 2 (6th Cir.1995) (holding Johnson inapplicable to review of an order denying a motion for summary judgment where the plaintiff's version of the facts failed to state a claim under the Eighth Amendment).
 
 III. QUALIFIED IMMUNITY
 
 23
 The Sixth Circuit normally reviews a denial of a summary judgment motion for abuse of discretion. Hanover Ins. Co. v. American Eng'g, 33 F.3d 727, 730 (6th Cir.1994). However, because the denial of a summary judgment motion related to qualified immunity is limited to questions of law under Johnson, de novo review is appropriate. See Williams v. Kentucky, 24 F.3d 1526, 1532 (6th Cir.1994), cert. denied, 115 S.Ct. 358 (1994).
 
 
 24
 Here, we must address two separate questions. To defeat summary judgment, Herring must demonstrate that both questions should be answered in the affirmative. First, the court must determine whether, viewing the facts in the light most favorable to Herring, the force used by Lacy was excessive, violating the objective reasonableness standard of the Fourth Amendment. Graham v. Connor, 490 U.S. 386, 388 (1989) (excessive force claims judged against Fourth Amendment objective reasonableness standard, not substantive due process standard); Johnson, 115 S.Ct. at 2159 (examine facts bearing on excessive force claim in light most favorable to subject of force). Second, assuming the force used was excessive, this court must determine whether the excessive nature of the force used was clearly established on June 3, 1993, when Lacy took the actions that are at issue here. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) ("government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known").
 
 
 25
 In the light most favorable to Herring, this is what happened at the Akron police station on June 3, 1993: Joseph Herring arrived at a relatively empty station after Gaines had already begun to question his son. He asked Lacy if he could sit in. Lacy refused because he thought that Herring was lying about being Konrad Herring's father. While Lacy was away from the front desk, Herring located his son, and sat in on Gaines's questioning without any objection from Gaines. Lacy discovered that Herring was missing and, suspecting what had happened, tracked him down to the interrogation room. Lacy asked Herring to step outside, and Lacy struck Herring without provocation, knocking him to the floor, shouting 'when in my house, do as I say!' He then pulled Herring up by the hair and put in him in a half-nelson, dragging him over to, and then flinging him upon, a desk.
 
 
 26
 Herring then went to a hospital emergency room, where he was diagnosed with minor neck strain and sent home with a prescription for an over-the-counter medication. Later, however, Herring's condition worsened--he developed pain in his arms and persistent headaches. It was discovered that Herring had facial contusions and a concussion, which the emergency room had failed to notice or diagnose. He also had a herniated disc. His personal physician opined that his prognosis was guarded.
 
 
 27
 Unfortunately for Lacy, these facts, if proved at trial, could lead to the conclusion that he used excessive force. To determine whether objective reasonableness in the use of force exists, the Sixth Circuit applies the three factors set forth in Graham: (1) "the severity of the crime at issue," (2) "whether the subject pose[d] a threat to anyone," and (3) "whether the suspect [was] attempting to escape or ... resisting arrest." Patrick v. City of Detroit, 906 F.2d 1108, 1115 (6th Cir.1990). Here, each of these factors, particularly the third, counsels in favor of finding an excessive use of force, given these assumed facts. First, Lacy has not pointed to any crime that Herring might have committed by roaming around the police station to locate his son, even without permission. Even assuming that Herring's actions were potentially criminal or illegal, it appears that the severity of these actions are slight.[5] Second, Herring does not seem to have posed a threat to anyone, especially in light of the fact that Gaines did not object to Herring's presence at his son's questioning. Third, Herring alleges that he did not resist Lacy in any way. See Neal Miller, Less-Than-Lethal Force Weaponry: Law Enforcement and Correctional Agency Civil Liability for the Use of Excessive Force, 28 Creighton L.Rev. 733, 765-66 (1995) (arguing that excessive force exists where force is used in any of the following circumstances: (1) where the subject does not resist, (2) where the police officer overreacts by continuing to use force after the subject has ceased resisting, (3) where the officer inflicts summary punishment). The unifying principle in Fourth Amendment excessive force cases is that an officer may use force to apprehend law-breakers and to protect himself or others. An officer may not use force after the subject has already completed the acts which were threatening, unless he aims to prevent additional threats by the subject.
 
 
 28
 Applying Patrick to the facts of this case as we must assume them to be also leads to the conclusion that the law on the excessive use of force was sufficiently clear to warrant denying qualified immunity to Lacy.
 
 
 29
 The cases that Lacy cites to avoid this conclusion do not help him. Lacy cites Hudson v. McMillian, 503 U.S. 1, 9 (1992), for the proposition that the use of de minimis force is always constitutionally permissible. While this case might be apposite if this court were considering the facts as Lacy states them, the force that Lacy used as described by Herring was not de minimis. A concussion and a herniated disc are arguably serious injuries. And we are forced to assume that Herring actually suffered from these injuries as a result of Lacy's use of force. Moreover, Hudson was an Eighth Amendment, not a Fourth Amendment, excessive force case. In a case involving a Fourth Amendment claim, a panel of this circuit ruled that the extent of injury is not a crucial factor in a § 1983 excessive force claim. Kuehne v. Hugan, 68 F.3d 474, 1995 WL 608169, at * 3 (6th Cir.1995) (unpublished per curiam).
 
 
 30
 Lacy also quotes Graham's pithy statement that " '[n]ot every push and shove, even if it may seem unnecessary in the peace of a judge's chambers' ... violates the Fourth Amendment." Graham, 490 U.S. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033 (1973)). First, in the quoted passage the Court grants that some pushes and shoves may be unconstitutional. Here, if the push that Lacy concedes happened was administered to Herring under the circumstances that Herring alleges (Herring was not resisting Lacy or attempting to enter unauthorized areas of the police station) and the push was hard enough that it was reasonably foreseeable that it would cause the injuries Herring claims, then that push was unconstitutional. Moreover, the court is compelled to assume, under Johnson, that Herring was struck, not simply pushed, and that he was placed in a half-nelson.
 
 
 31
 Collins v. Nagle, 892 F.2d 489 (6th Cir.1989), is also distinguishable from this case. In Collins, Kentucky mining investigators arrested two individuals operating an illegal mine. Both individuals refused to provide identification when asked to do so by these investigators. The investigators then placed the two individuals under arrest, and in the process caused them to suffer bruises for which no medical treatment was sought. Id. at 496-97. A third individual arrived when the investigators were in the process of arresting the other two, and one investigator brandished a gun, as a warning to the third person to leave the mining site. This person claimed to have suffered mental distress and damage to his reputation as a result of being threatened with the gun. The investigators in Collins were justified in using force to arrest subjects who were resisting, and they properly used the threat of force to deter any resistance by the third individual. Again, by contrast, Herring alleges he was not resisting Lacy. And, of course, Lacy did not simply threaten the use of force, he admits he used some level of force.
 
 
 32
 Lacy offers three additional arguments to support the conclusion that the force he used was not so excessive as to constitute a violation of clearly established constitutional rights. Two of these can be dismissed quickly. The first argument is that Lacy was entitled to use such force because he found himself in a crowded police station where an officer had been attacked a few weeks earlier. The problem with this argument is two-fold: (1) there is a factual dispute about whether the station was crowded or empty; and (2) even if this court were to assume that the station was crowded and dangerous, this fact cannot provide a justification for gratuitously inflicting pain on Herring. The second argument is that the force that Lacy used was "instinctive and reactive." The instinctive and reactive use of force after a subject no longer offers resistance clearly violates a subject's constitutional rights, however. That Lacy may have felt an impulse to teach Herring a lesson does not require this court to provide Lacy with qualified immunity.
 
 
 33
 Lacy's final argument is similarly meritless, but requires a fuller treatment. Citing Hansen v. Westerville City Sch. Dist., 43 F.3d 1472, 1994 WL 622153 (6th Cir.1994) (unpublished per curiam), cert. denied, 115 S.Ct. 2611 (1995), and Nabkey v. Gibson, No. 1:89-CV-53, 1990 U.S. Dist. LEXIS 14232 (W.D.Mich. Oct. 19, 1990), Lacy argues that the setting of the police station is so unique, and the interest in preventing civilian visitors from wandering into restricted areas in a police station so important, that the force he chose to use on Herring is justified, or at least the principle that excessive force should not be used in such circumstances was not clearly established on June 3, 1993. This argument is interesting and novel, but it must fail for a number of reasons. Putting aside the fact that Hansen is an unpublished opinion, and under Sixth Circuit Rule 24(c), the citation of such opinions is disfavored, the case did not rest on such a rationale. It is a straightforward case in which summary judgment granted by the district court in favor of the police on a § 1983 excessive force claim was affirmed, largely because the subject admitted that he struggled with the police, who were trying to arrest him for disrupting a school board meeting. Hansen, 43 F.3d 1472, 1994 WL 622153, at ** 6. There was no reliance in the case on the special setting of the school board meeting.
 
 
 34
 In Nabkey, the subject rushed into a district judge's office without authorization and was led away by federal marshals and district court personnel. These federal employees took the subject's arm forcibly, causing her "pain and agony," escorting her outside the courthouse "like some big criminal," and preventing her from returning to collect personal effects she left behind. Nabkey, 1990 U.S. Dist. LEXIS 14232, at * 4. Nabkey does rest partially on the rationale that a federal courthouse is a special setting, but it is not binding on this court, and is immediately distinguishable by the fact that the federal marshals who responded to the judge's secretary's push of an alarm button did not arrive to find the subject passively observing the judge with the judge's tacit permission, and by the fact that there was no allegation that the marshals ever struck the subject, but merely forcibly carried her out of the courthouse.
 
 
 35
 Whether federal courthouses are a special setting that justifies a more liberal use of force on the sliding scale of Graham is a question this court need not address in this case. In any event, a police station is not such a special setting. If a police station were such a special setting, excessive force could be justified by hauling suspects into the police station and then inflicting a beating on them. Moreover, in contrast to a crowded street corner, where a subject might injure innocent bystanders, the population of a typical police station disproportionately contains better trained, better armed and more vigilant persons, so that the constitutional quantum of force properly used in the police station might actually be lower than on such a crowded street corner under Lacy's rationale. Lacy is not entitled to qualified immunity on the grounds that the police station is a special setting.
 
 IV
 
 36
 On the facts as viewed in the light most favorable to Herring, we conclude that the district court properly refused to grant summary judgment to Lacy on his claim of qualified immunity. We emphasize that in reaching this conclusion we did not question Herring's story, which may not be credible on further examination. Finally, we note that, in the future, district courts should act in accordance with Johnson, and make it standard practice to state the facts of the case as assumed by the court when ruling on a motion for summary judgment on grounds of qualified immunity. Johnson, 115 S.Ct. at 2159. The order of the district court is AFFIRMED.
 
 
 
 [1]
 The Honorable David W. McKeague, United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [1]
 Appellee Herring's brief gives Almondine's surname as "Herring," although the record reflects that since the interview of Konrad at her home she has since married Leon Poole. The record on appeal does not state Almondine's current surname
 
 
 [2]
 This seems to indicate that the physician thought that Herring was a 29 year-old male. However, the bottom of the same form gives Herring's birthdate as 12/13/47
 
 
 [3]
 Dr. Ferreri's expertise seems to include extensive training in reaching legal conclusions
 
 
 [4]
 In dicta, the Court considered whether pendent appellate jurisdiction would be appropriate in cases where reviewable and unreviewable claims are linked in the same appeal, but did not endorse the use of this doctrine by the appellate courts. The Court noted, however, that even in circuits where pendent appellate jurisdiction exists, a court of appeals would probably not choose to exercise this power where "the appealable issue appears simply a means to lead the court to review the underlying factual matter." Johnson, 115 S.Ct. at 2159. Because pendent appellate jurisdiction has never been invoked by the Sixth Circuit, we will not adopt this doctrine here. Williams v. Kentucky, 24 F.3d 1526, 1542 (6th Cir.), cert. denied, 115 S.Ct. 358 (1994). Moreover, Lacy did not recognize the jurisdictional question in this case, let alone urge this court to create and then exercise pendent appellate jurisdiction
 
 
 [5]
 This does not mean that Herring was not in fact breaching some civil or criminal law in Ohio by entering unauthorized areas of a police station, merely that Lacy has not pointed to any such laws to defend his actions. It is also significant that there is no evidence that Lacy had any such laws in mind when he used force against Herring, judging by the silence on this subject in Lacy's deposition